MACKIE-CLEMENS FUEL COMPANY, Respondent, v. M. G. BRADY et al., Appellants.

Springfield Court of Appeals, January 18, 1919.

1. **PARTNERSHIP:** Existence: Question of Law. Where facts are not in dispute and contract is in writing, the question of partnership or no partnership is one of law.

2. **MINES AND MINERALS:** Partnership: Creation: Conditional Assignment of Interest in Mine Lease. Assignment of half interest in mining lease, conditioned upon assignee's acceptance upon inspection of mining property after dewatering of mine, and under agreement whereby assignee in the event of acceptance was to share in net profits pending acceptance, expenses to be borne by assignor, did not create partnership relation making assignee liable for coal bought by assignor for use in dewatering mine, though consideration was paid before dewatering was completed.

3. ———: ———: Existence: Estoppel. Assignee, being engaged in business in another State, any paying no attention to the dewatering, could not be held liable for the coal as a partner, on ground of estoppel.

4. **PARTNERSHIP:** Existence as to Third Party. Partnership exists as to third party only where it exists between the parties themselves, except where alleged partner held himself out as such.

5. ———: Intention. Whether a contract creates a partnership relationship depends upon the intentions of the parties.

6. ———: Creation: Contract. Partnership relation is created only by contract, and does not arise by operation of law

7. ———: Existence: Name Given Arrangement. If the terms of the contract existing between the parties do not constitute a partnership, none will be declared, even though the parties call the arrangement.

8. EVIDENCE: Best Evidence: Existence of Partnership. The best evidence of the existence of a partnership consists of the agreement or contract between the parties, but it may be proved by any competent evidence.

9. PARTNERSHIP: Existence: Proof. As between the alleged partners themselves, the fact of partnership cannot be established by proof of independent facts from which the principal fact is inferable, in the absence of direct evidence of a purpose to form a partnership.

10. ———: ———: Joint Owners. Joint owners or tenants in common of property, real or personal, do not become partners in absence of contract, though they participate in profits or losses arising from such ownership.

11. MINES AND MINERALS: Partnership: Existence: Proof: Parties in Suit. Where contract between such parties negatived any inference of partnership in mining business, the fact that they were joined as joint owners of the lease in suit against lessor was of very little importance in determining whether partnership existed.

Appeal from Jasper County Circuit Court.—*Hon. R. A. Pearson*, Judge.

AFFIRMED IN PART AND REVERSED IN PART.

*J. D. Harris* for appellants.

*George J. Grayson* for respondent.

BRADLEY, J.—Plaintiff, respondent here, brought suit against Brady and Mitchell on Account for coal seeking to recover a balance of $425.10. The cause was tried below before the court without a jury and judgment went for the plaintiff and defendant Mitchell has appealed.

The only question for determination here is whether or not there was a partnership existing between Brady and Mitchell during the time the coal was bought and

used. Brady, on December 5, 1916, leased from the Hebaa Mining Company certain mining lands in Newton county on which there was a concentrating plant and some machinery, and upon which a shaft had been sunk and some drifts had been run. It appears that Mitchell and Brady in March, 1917, entered into a contract by which under certain conditions Brady was to convey to Mitchell a one-half interest in the entire mining property. The entire account for coal which was used in the mine was made after this contract was executed. The contract is as follows: "This agreement, made and entered into on this the 7th day of March, 1917, by and between M. G. Brady of Joplin, Missouri, hereinafter designated as first party, and L. D. Mitchell of Van Buren, Arkansas, hereinafter designated as second party, is as follows: For and in consideration of the sum of one ($1) dollar cash in hand paid and for the further consideration of twelve hundred ($1200) dollars to be paid by second party to first party as hereinafter provided, first party has agreed, and does, by these presents sell, assign, transfer and set over to second party an undivided one-half interest in and to a certain mining lease made and entered into on December 5, 1916, by and between Hebaa Mining Company as lessor, and M. G. Brady (first party herein) as lessee, covering the following described real estate in Newton county, Missouri, to-wit: (Here follows description) Second party shall pay to first party the sum of five hundred ($500) dollars upon the execution of this agreement, and the balance of seven hundred ($700) dollars shall be due and payable after second party shall inspect the said mining property after the water shall be dumped therefrom by first party, as hereinafter provided, and the said property shall be found satisfactory to second party. Second party agrees to make an inspection and examination of the mine and underground drifts of said property immediately after the water shall be pumped therefrom sufficient for making such inspection and examination after being notified that the property

is ready for such inspection. . Said notice shall be sent or given to first party at his place of business or residence at Van Buren, Arkansas.

First party agrees to immediately commence the work of pumping and dewatering said mine and underground so that the inspection above provided for may be made, and to continue such work until the inspection shall be made by second party. This agreement and assignment together with the mining lease above mentioned and described shall be placed in escrow in some bank in the city of Joplin agreed upon by the parties hereto with instructions to deliver this agreement and assignment to second party upon the payment by him to first party of the said sum of $700, and with further instructions, that in the event second party shall fail or refuse to accept said property after making an inspection of same, then in that event this agreement and assignment and the lease shall be returned to first party. First party shall have the right to mill the tailings upon said property and to sell the ore produced therefrom during the time that he is dewatering said mine for the purpose of preparing it for an inspection with the understanding, however, that in the event second party shall pay the balance due on purchase price, as above provided, first party shall account and pay to second party one-half of the net profits derived from such operations.''

The question of partnership or no partnership is one of law, since the essential facts are not disputed and the contract between the parties is in writing. [20 R. C. L., sec. 55, p. 849; Ellis v. Brand, 176 Mo. App. 383, 158 S. W. 705; Skinner v. Whitlow, 184 Mo. App. 229, 167 S. W. 463.] The contract is set out in full and its essential features are that defendant Brady, being the owner of a mining lease, contracted to sell and assign a half interest in same to defendant Mitchell for $1200, of which $500 was paid at once and the balance of $700 was to be paid, if at all, after the mine and underground drifts were freed of water so that an inspection could

be made. Mitchell could then buy or not as he pleased. In order to carry out the purchase agreement, the contract and an assignment of a half interest in the lease were deposited in a bank with instructions that if Mitchell paid the $700, same were to be turned over to him, otherwise to be returned to Brady. As to the work and expenses of dewatering the mine, so that Mitchell could inspect same before determining whether he would take the half interest in the lease or not, the contract is explicit and provides: "First party (Brady) agrees to immediately commence the work of pumping and dewatering said mine and underground so that the inspection above provided for may be made and to continue such work until the inspection shall be made by second party."

This contract was made on March 7, 1917, and the coal bill sued for in this case and for which plaintiff seeks to hold defendant Mitchell liable as a partner of Brady was incurred by Brady alone in pumping the water from this mine; and the first car of such coal was purchased by him March 13, 1917, the second on March 20th, and thereafter at intervals, and used by Brady in pumping the water from Brady's mine, for Mitchell had as yet only contracted to purchase a half interest conditionally. Suppose Brady had pumped out the water, incurring therein unpaid bills for coal or other expense, and Mitchell had concluded to take the half interest in the lease and had paid the $700, balance of the purchase price, would Mitchell be liable as Brady's partner for the unpaid bills? Certainly not— no more than he would have been had he declined to take such half interest.

There is no question here of Mitchell being bound by way of estoppel, by reason of holding himself out as a partner, or his having induced plaintiff to sell the coal on that supposition. The case was not tried on that theory, and there is no evidence to support such a theory. Mitchell lived and was engaged in business in Arkansas and had no interest in the coal as purchaser,

and paid no attention to the work of dewatering the mine. The plaintiff sold the coal to Brady, charging it to him on its books, though the account sued on is against the Mary E. Mining Company, an old name applied to the mine and of which defendant Mitchell never heard as a partnership name. The only theory on which plaintiff seeks to hold Mitchell is that he was in fact and in law a partner of Brady when the coal was sold to Brady. Except where the third party makes a case by reason of the alleged partner holding himself out as such, the question of partnership is the same as between the parties themselves. [Distilling Company v. Wilson, 172 Mo. App. 612, 156 S. W. 23; Nugent v. Armour Packing Company, 208 Mo. 480, 106 S. W. 648.]

Whatever may be the obligations and incidents resulting from a partnership such as sharing profits and losses, mutual agency, community of interests, etc., the formation of a partnership is by contract; and as in the case of all contracts, the cardinal rule for interpreting the contract and determining whether it constitutes a partnership or not is the intention of the parties. "In practically all definitions of partnership the element of contract is fundamental. It is one of the chief characteristics of the partnership relation that it is created only by the voluntary contract of the parties, and that it does not arise in any case by operation of law. Persons cannot become partners except by agreement, expressed or implied." [20 R. C. L., sec. 4, 802.] "The particular test as to the existence of the partnership relation which is most widely accepted today and which is applicable especially as between the parties themselves irrespective of the rights of third persons is that a partnership is formed and exists only when it was the intention of the parties that they should be partners. Partnership contracts, like other contracts, are governed by the intention of the parties. Every partnership rests on the mutual consent of the members. . . . On the other hand, if the terms of the contract existing between the parties do not consti-

tute a partnership, none will be declared, even though the parties in words call the arrangement one." [20 R. C. L., sec. 36, 831.] And again at section 52, 847, of this same work this is said: "The best evidence of the existence of a partnership consists of the agreement or contract between parties, but it may be proved by any competent evidence. As between the alleged partners themselves, the fact of partnership cannot be established by proof of independent facts from which the principal fact is inferable in the absence of direct evidence of a purpose to form a partnership." Such is the law in this State as shown by numerous decisions. [Chapin v. Cherry, 243 Mo. 375, 403, 147 S. W. 1084.] Mining Company v. Swope, 204 Mo. 48, 102 S. W. 561, is a case much like this, for in that case it was sought to hold Swope as a partner of Howard because of a contract by which Swope was to acquire an interest with Howard in a mining lease, but providing that Howard should purchase same in his name and "he shall have the exclusive control and management of the said land and the working and development thereof, until a corporation shall be organized as is contemplated to which said land shall be conveyed." The court held that Swope was not a partner of Howard and not liable for obligations incurred by Howard in purchasing and operating such mine. The court said: "Except in cases in which parties have held themselves out as copartners and credit has been extended to them as such, when in fact they were not partners between themselves, a partnership is a relation between two or more competent persons resulting from a contract, and accordingly only exists where the parties intend to enter into a contract of partnership, for this, like other contracts, must be construed according to the manifest intention of the parties and must be determined by the contract itself and the surrounding circumstances. [Parsons on Partnership, page 58; Mackie v. Mott, 146 Mo. 1. c. 254, 47 S. W. 897; McDonald v. Matney, 82 Mo. 1. c. 365; Priest v. Chouteau, 85 Mo. 398.] It has

often been ruled in this State that a mere participation in profits and loss does not necessarily constitute a partnership between the parties so participating" In Kellogg Newspaper Company v. Farrell, 88 Mo. 594, it is held that where the owner of property (and the same would be true of one contracting to become owner in whole or in part) contracts with another to take over such property who "agrees to conduct the business in his own name, to pay all expenses attending the running thereof, and to pay one-half the net proceeds of the concern to the party of the first part, quarterly," such contract does not create a partnership. The court there said: "That a mere participation in profits and loss does not necessarily constitute a partnership between the parties so participating. . . . It is a question of intention. . . . Each case must be determined upon its own peculiar facts. In seeking for the intention of the parties, the whole instrument must be looked to, and viewing the agreement in question in its entirety, it is apparent, we think, that it was not the intention of Farrell and Lindenberger to form a partnership between themselves, for it is expressly stated that Farrell turned over to Lindenberger the Post Observer newspaper, not to be conducted by them jointly as partners, but, on the contrary, to be conducted by him in every respect as if he were the owner thereof, and that he should conduct the business in his own name and pay all the expenses attending the running thereof. These expressions negative any intention of the parties to form a partnership. The reservation of the right to control the political course of the paper gave Farrell no control over its business affairs."

By the contract in question, the defendant Mitchell might or might not become a joint owner of the mining lease. But joint owners or tenants in common of property, real or personal, do not become partners, though they participate in the profits or losses arising from such joint ownership. The fact that tenants in common of chattels use the property so as to produce a

profit which, less expenses, is shared between them, does not make them partners in the absence of a contract to become such in carrying on a common business in the use of such property. [20 R. C. L., secs. 7 and 8, pages 806 and 807.] And much less are they partners where they contract that one only shall conduct the business connected therewith at *his own expense* even if he pay the other a part of the net profits. [Hughes v. Ewing, 162 Mo. 261, 62 S. W. 465.]

It is held in Ellis v. Brand, 176 Mo. App. 383, that where the owner of land contracted with a doctor that such doctor would erect a hotel or sanitarium on land of such owner and operate the sanitarium until the doctor had received from the profits sufficient to re-imburse him for the money thus expended, at which time they would contract as to the future, there was no partnership liability of the landowner in the expenses of conducting the hotel. This was held as a matter of law though the doctor swore they were partners and participated in the profits and losses, the court says: "Whether a partnership existed is a question of intention on the part of the parties, which must be arrived at from the contract itself and the surrounding circumstances. And a mere participation in profits and losses does not alone constitute a partnership between the parties so participating."

Skinner v. Whitlow, supra, holds that the question of partnership under a contract is one of law, the court there holding there was no partnership, though there is a sharing in profits and losses and witnesses testifying that the parties were partners, such evidence disregarded as a mere conclusion. The contract in question provides that pending the time of dewatering the mine and until defendant Mitchell exercises his option to buy or refuse a half interest in the lease, Brady, the owner of the lease, shall have the right to mill the tailings on such land and sell the ore produced therefrom and in the event Mitchell buys such half interest, then Brady shall account to him for one-

half the net profits. Nothing is shown as to the extent this provision was carried out further than that it proved unprofitable and Mitchell received nothing. It is not even shown that the coal sued for was used in or had any connection with this branch of the work. But however that may be, since Brady was to mill the tailings at his own risk and Mitchell was to have no part or interest in it except to receive the net proceeds in case he bought the half interest, the essentials of a partnership as to this work did not exist according to all the authorities above cited.

Reverting again to the contract by which Mitchell was to purchase at his own option, after the mine was dewatered and inspected by him, a half interest in the mining lease, we find that so far from forming a present partnership, it does not provide for or contemplate a future partnership. Of course if Mitchell declined to take the half interest after such inspection, that ended the matter and Mitchell lost the $500 he had paid. If he decided to purchase, he and Brady would become joint owners of the lease and nothing more. They might or might not conclude to operate such mine as partners or otherwise. They might sublease on the basis of a royalty, or one joint owner might lease from the other and operate by himself.

Plaintiff's contention is that on April 7th the defendant Mitchell waived his right to wait until the mine was completely dewatered by Brady and inspected by himself before exercising his option to buy the half interest and then paid the $700 and completed the purchase. Grant that this is true, yet that merely made him and Brady joint owners of the lease and not partners even in the future. Much of the coal bill sued for was already incurred and plaintiff sues on the theory that Mitchell and Brady were partners from the beginning. By what sort of reasoning the payment of the $700 to complete the purchase of a half interest in the lease could relate back and make them partners from the beginning is not disclosed. Plaintiff

is driven to this position merely because there is not the slightest evidence of a new contract making defendants partners at that time. Though defendant Mitchell may have chosen to pay the $700 before it was due, yet the obligation of Brady to finish pumping the water from the mine would continue and Both Brady and Mitchell recognized that it did continue, for Brady says he was out of money and asked that this money be paid, whether as purchase price or as a loan, to enable him to continue the pumping of water, which Brady continued to do necessitating his purchase of more coal.

We do not think it material whether this $700 was paid as part of the purchase price of the half interest in the lease or advanced as a loan, to Brady to enable him to complete his contract of dewatering the mine. Mitchell came to Joplin the second time, prepared to inspect and pay for the half interest in the lease, on Brady's representation that the work of dewatering the mine was completed. This was a mere subterfuge of Brady, and when Mitchell came the second time, Brady frankly told him that this work was not yet done, and he could not complete it for want of money. The question here suggests itself that if Mitchell was Brady's partner in the work of dewatering the mine, why did not Brady call on him to put up his half of such expenses, instead of asking for either a loan or payment of the purchase price. Mitchell swears that he loaned Brady the $700 and his reason for so doing is that he already had sunk $500 in the enterprise and hoped to recoup all losses by loaning this amount to enable Brady to strike it rich. Brady on cross examination testified: "Q. Didn't you represent to Mr. Mitchell you were short of finances and you would have to have some money at that time to carry on operations? A. Yes, sir. Q. And when he advanced the $700 you offered to secure him by putting up your interest there, your holdings there, as collateral too, didn't you? A. The proposition was made to Mitchell to this effect, that if he didn't feel secure that I would put up my interest."

If Mitchell had paid the $700 as balance of the purchase price, he was entitled to take from the bank the assignments of the half interest in the lease and this was not done. On the contrary, both parties recognized the right of Mitchell to purchase or not as yet subsisting, but Brady told Mitchell that in his opinion the mine was absolutely worthless, and that it would be useless for him to come and inspect. In addition to the payments as provided in the contract, Mitchell advanced the sum of $775. As to these payments by Mitchell to Brady, the same situation existed as to Brady being out of money with which to dewater the mine and Mitchell loaned him the additional money. So they both testified. Brady, testifying for plaintiff, says: "Q. Now in the meantime after the $700 had been advanced under the circumstances that you have detailed, and before the mine was dewatered and before you could tell what it was going to show, I will ask if it isn't a fact you again on different occasions communicated to Mr. Mitchell you were hard up for funds and you would have to have a loan to carry on the work and he made you some other advancements? A. Yes, sir, that is true. Q. And those loans aggregated how much? Do you know off hand? A. About $375. Q. The fact is two of them were three hundred and one for one hundred and one for seventy-five dollars? A. I haven't refreshed my memory on that. That could be correct. I won't dispute it." Mitchell testified: "Q. What other loans did you make him? How many loans did you make him, if any at all? A. Four. Q. What were the abounts? A. Two for $300 each; one for $100 and one for $75. Q. Can you give the dates of the loans? A. I can give the dates of the checks, yes, sir. The first $300 check was dated April 14th; second $300 check was dated April 21st. On May 11th, $100 and on May 20th, as I have it here, was $75. Q. And you never then did approve of the property and never did take it up? A. No, sir. Q. Did you go ahead with the enterprise or turn it down? A. After it was dewatered, it was turned down.

Q. Did you have anything to do with the ordering of any of this coal. A. Nothing whatever, Q. You lived at Van Buren, Arkansas? A. Yes, sir. Q. And you are engaged in what kind of business down there? A. Retail lumber business. Q. You had nothing to do with the operation of this plant out there? A. No, sir. Q. What was the reason for letting him have these subsequent amounts? A. Simply because he made representations to me he had to have this money to continue to dewater the mine. Q. In other words you didn't loan him any money for any personal expenses of his; you let him have the money in order that he might continue this work? A. Yes, on his specific request as a loan. I think I have a letter on file in which he says as a loan; he doesn't acquire it as an interest in the mine but wanted me to loan him the money and it is charged on my books to him that way now.''

Some time after the failure of the mine venture Brady and Mitchell joined in a suit against the Hebaa Mining Company, Brady's lessor to recover damages for alleged misrepresentations concerning the mining property. A copy of this petition was introduced in evidence as tending to show that a partnership existed between Mitchell and Brady in the mining venture. Some stress is laid on this fact. In that petition they did not sue as partners nor does the petition state facts, which if true, make them partners. They sued as joint owners of the lease. Nor is Mitchell contradicted in saying that Brady solicited him to allow his name to be used as a party plaintiff in that suit, promising that if he got damages he would reimburse Mitchell for the money loaned; that Mitchell told the attorneys bringing such suit his real connection with the lease and with Brady; and that Mitchell never saw the petition. The lawyers no doubt thought best to make Mitchell a co-plaintiff with Brady and used the word ''they'' throughout the petition, even to saying that the lease and the false representations were made to them jointly which nobody contends to be the fact. The attorneys proceeded

on the theory that it would only be necessary to prove sufficient of the facts alleged to make a case for one or both plaintiffs. In our view of the law these collateral and extraneous facts are of little importance on the question of partnership for they cannot change the contract existing between Mitchell and Brady at the time the coal bill sued for was incurred.

The contract between the parties under which the work of dewatering the mine was carried on and in the doing of which work the coal bill sued for was incurred, provides that Brady shall do such work and bear such expenses whether Mitchell elected to take the half interest or not in the lease, and whether he did or not is immaterial. This contract negatives any inference or presumption of partnership growing out of the extraneous and collateral facts and determines that there exists no partnership liability of Mitchell. It follows from the above and foregoing that the judgment should be affirmed as to defendant Brady and reversed as to defendant Mitchell, and it is so ordered. *Sturgis, P. J.,* and *Farrington, J.,* concur.